**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | |
|---|---|
| VICTORIA MILLER, on behalf of herself and all others similarly situated,<br><br>                       Plaintiff,<br><br>vs.<br><br>KEESLER FEDERAL CREDIT UNION,<br><br>                 Defendant. | Civil Action No.: 1:21cv326TBM-RPM<br><br><br>**AMENDED CLASS ACTION PETITION**<br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiff Victoria Miller, on behalf of herself and all others similarly situated brings this class action complaint against Keesler Federal Credit Union, and alleges the following:

**INTRODUCTION**

1.      This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant, Keesler Federal Credit Union ("Keesler" or the "Credit Union"), arising from its improper overdraft fee ("OD Fees") practices.

2.      Plaintiff alleges that Keesler assesses and collects "overdraft fees" ("OD Fees") on accounts that were never actually overdrawn.

3.      This practice breaches contractual promises made in Keesler's adhesion contracts.

4.      In plain, clear, and simple language, the checking account contract documents discussing OD Fees promise that Keesler will <u>only</u> charge OD Fees or NSF Fees on transactions where there are insufficient funds to cover them.

5.      Plaintiff also challenges the assessment and collection of unnecessary and futile Overdraft Transfer Fees ("ODT Fees"). Keesler charges accountholders OD Fees for transactions

which purportedly overdraw an account. Keesler purports to charge ODT Fees to transfer funds from an accountholder's savings account to his checking account when doing so is necessary to avoid an OD Fee on the checking account. However, Keesler makes such transfers, and assesses such ODT Fees, even when doing so does not avoid an OD Fee on a checking account, causing accountholders to pay <u>both</u> and ODT Fee and an OD Fees on a single transaction.

6.      These practices breach contractual promises made in Keesler's adhesion contracts.

7.      Keesler's customers have been injured by Keesler's improper practices to the tune of millions of dollars taken from their accounts in violation of their agreements with Keesler.

8.      On behalf of herself and the Classes, Plaintiff seeks damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

## <u>PARTIES</u>

9.      Plaintiff Victoria Miller is a resident of Harrison County, Mississippi, residing therein at 5450 highway 90 Lot 2, Bay St. Louis, Mississippi 39520.  Victoria Miller holds a Keesler checking account.

10.      Defendant Keesler is a federal credit union headquartered in Biloxi, Harrison County, Mississippi and is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Classes, which includes the issuance of debit cards for use by its customers in conjunction with their checking accounts. Keesler operates banking centers, and thus conducts business, throughout the States of Mississippi, and Louisiana, as well as in the United Kingdom.

11.      Pursuant to Fed. R. Civ. P. 4(h)(1), Keesler may be served with process by delivering a summons and copy of this complaint to an officer, managing agent or general agent

or upon an agent appointed to receive service or authorized by law to receive service.  Keesler's international headquarters is located at 2602 Pass Road, Biloxi, Mississippi 39531-2728.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed class is comprised of at least 100 members; (2) proposed class members reside in at least Mississippi, Louisiana, and overseas, meaning at least one member of the proposed class resides outside of Mississippi; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs. This Court also has federal question jurisdiction Pursuant to 28 U.S.C. § 1331.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Keesler is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

I. **KEESLER CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT**

A. **Overview of Claim**

14.    Plaintiff brings this cause of action challenging Keesler's practice of charging overdraft fees on what are referred to in this complaint as "Authorized Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions")

15.    Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Keesler immediately reduces accountholders checking accounts for the amount of the purchase, sets aside funds in a checking account to cover

3

that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds to cover these transactions because Keesler has already sequestered these funds for payment.

16.     However, Keesler still assesses crippling OD Fees on many of these transactions and mispresents its practices in its Account Documents.

17.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Keesler later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

18.     Keesler maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Keesler sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

19.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

4

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 22, 2009).

20.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

21.     Still, despite keeping those held funds off-limits for other transactions, Keesler improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

22.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions,

examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

23.     There is no justification for these practices, other than to maximize Keesler's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Keesler is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Keesler was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

24.     Besides being unfair and unjust, these practices breach contract promises made in Keesler's adhesion contracts—contracts which fail to inform accountholders about, and in fact, misrepresent, the true nature of Keesler's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

25.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that Keesler will only charge OD Fees on transactions that have insufficient funds to "cover" that debit card transaction.

26.     In short, Keesler is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.     Mechanics of a Debit Card Transaction**

27.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Keesler. When a merchant physically or

virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Keesler, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

28.     At this step, if the transaction is approved, Keesler immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

29.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 22, 2009).

30.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

31.     Keesler (like all credit unions and banks) decides whether to "pay" debit card transactions at authorization.  After that, Keesler is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point—when Keesler may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the

charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

32.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

**C.      Keesler's Account Documents**

33.     Plaintiff has a Keesler checking account, which is governed by Keesler's standardized "Deposit Account Terms and Conditions" document.

34.     The Overdraft Disclosure promises links authorization and covering of transactions at the moment of authorization; "available balance" is reduced for holds, including those placed immediately on debit card transactions; and that "non-sufficient funds items" are only those items that "overdraw[] your account":

> Overdraft privilege is a discretionary service that protects you (up to an automatically assigned limit) when there is sufficient money in your checking account[.]
>
> [ . . .]
>
> **We may also authorize and cover ATM transfers or withdrawals and debit card** purchases if you have requested us to do so by opting in. **Please be aware that your available balance may be affected by merchant authorizations, which could create additional overdrafts and associated fees**.
>
> [ . . .]
>
> As long as your account is maintained in "good standing," **we may approve your overdraft items within your current available Overdraft Privilege limit as a courtesy to you**.

(Emphasis added).

35.     The Deposit Agreement and relevant contract documents covering overdraft fees

provide that Keesler makes overdraft determinations when it decides to "permit" transactions, which is the moment of authorization for debit card transactions; it repeatedly states that Keesler will not charge OD Fees on transactions that have sufficient funds to "cover" them at the time they are initiated; that only transactions "drawn" against insufficient funds will be assessed OD Fees:

> Withdrawal Restrictions. We permit withdrawals only if your account has sufficient available funds to cover the full amount of the withdrawal or you have an established overdraft protection plan. Drafts or other transfer or payment orders which are drawn against insufficient funds may be subject to a service charge set forth in the Rate and Fee Schedule.

> [...]

> If on any day, the funds in your share account are not sufficient to cover drafts, fees or other items posted to your account, those amounts will be handled in accordance with our overdraft procedures or an overdraft protection plan you have with us. The Credit Union's determination of an insufficient account balance may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have funds to cover drafts, fees or other posted items. Whether the item is paid or returned, your account may be subject to a charge as set forth in the Rate and Fee Schedule. Except as otherwise agreed in writing, we, by covering one or any overdraft, do not agree to cover overdrafts in the future and may discontinue covering overdrafts at any time without notice. If we pay a draft or impose a fee that would otherwise overdraw your account, you agree to pay the overdrawn amount immediately.

36.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet Keesler assesses OD Fees on them anyway.

37.     The above promise means that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions.

38.     In fact, Keesler actually authorizes transactions on positive funds, sets aside those funds on hold, then fails to use those same funds to settle those same transactions. Instead, it uses

a secret posting process described below.

39.     All the above representations and contractual promises are untrue. In fact, Keesler charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Keesler may impose OD Fees on any APPSN Transactions.

40.     The Deposit Agreement and Overdraft Disclosure misconstrue Keesler's true debit card processing and overdraft practices.

41.     First, and most fundamentally, Keesler charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that Keesler will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

42.     Keesler assesses OD Fees on APPSN Transactions that ***do*** have sufficient funds available to cover them throughout their lifecycle.

43.     Keesler's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between Keesler's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

44.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

45.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Keesler does when it re-debits the account during a secret batching posting process.

46.     In reality, Keesler's actual practice is to assay the same debit card transaction twice

to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

47.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Keesler cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

48.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Keesler does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, Keesler releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

49.     This secret step allows Keesler to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which Keesler specifically set aside money to pay them.

50.     This discrepancy between Keesler's actual practices and the contract causes accountholders to incur more OD Fees than they should.

51.     In sum, there is a huge gap between Keesler's practices as described in the Overdraft Disclosure and Keesler's practices in reality.

**D.     Keesler Abuses Contractual Discretion**

52.     Keesler's treatment of debit card transactions to charge OD Fees is more than a breach of the express terms of the Account Documents. In addition, Keesler exploits contractual discretion to the detriment of accountholders when it uses these policies.

53.     The term "to cover" a transaction is undefined. Keesler uses it discretion to define

"to cover" in a manner contrary to any reasonable, common sense understanding of that term. In Keesler's implied definition, a transaction is not "covered" even if Keesler sequesters sufficient available funds for that transaction at the time it is made.

54.    Moreover, Keesler uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

55.    Keesler uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

### E.    Reasonable Consumers Understand Debit Card Transactions are Debited Immediately

56.    The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

57.    Keesler was and is aware that this is precisely how accountholders reasonably understand debit card transactions work.

58.    Keesler knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device; because they don't allow debt like credit cards do; and because the money comes directly out of a checking account.

59.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is

immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." See https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card  (last  visited November 14, 2018).

60.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full."

61.     That is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[1]

62.     Not only have consumers increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

63.     Keesler was aware of a consumer perception that debit transactions reduce an available balance *in a specified order* – namely, the moment they are actually initiated – and its account agreement only supports this perception.

**E.     Plaintiff's Debit Card Transactions**

64.     As examples, on December 5, 2020 and December 6, 2020, Plaintiff was assessed

_____

[1] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch, Mar. 23, 2016,   http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

OD Fees for debit card transactions that settled on those days, despite the fact that positive funds were deducted immediately, prior to those days, for the transactions on which Plaintiff was assessed OD Fees.

## II.  KEESLER CHARGES ODT FEES ON FUTILE TRANSFERS

### A.  Keesler's Account Documents

65.     Keesler offers an overdraft protection and prevention service in which it transfers funds from other accounts held by accountholders to cover what would otherwise be overdraft transactions on a checking account. It charges a per-transfer fee of $2 for this service.

66.     The express purpose of the transfer service is to prevent overdraft transactions and reduce the incidence of $25 OD Fees.

67.     However, Keesler automatically performs these overdraft protection transfers, and charges a $2 fee for doing so, even where the transfer will be wholly futile—i.e., where the transfer will not actually allow the accountholder to avoid an OD Fee on his checking account.

68.     For example, on March 25, 2020, and April 15, 2020, Keesler made an automatic overdraft protection transfer from Plaintiff's savings account to his checking account and charged her a fee of $2 for doing so. But that transfer did nothing to accomplish its supposed purpose, to prevent an OD Fee, since the transfer was insufficient to fully cover the purported overdraft transaction. As such, Plaintiff still incurred an OD Fee of $25, in addition to the $2 overdraft protection fee on a transaction that settled to his account that day.

69.     Keesler's account documents deceive consumers regarding the fact that it may charge two separate fees—up to $27 total—for a single overdraft.

70. The entire purpose of the overdraft transfer is to "cover an insufficient item." Yet the futile ODT Fees described above simply increase the total overdraft fees paid to $27 per transaction, not the $25 per transaction listed in the Fee Schedule.

71. Moreover, it was bad faith and totally outside Plaintiff's reasonable expectations for Keesler to use its discretion to transfer funds from another account—and assess a fee for doing so—when that transfer had no preventative purpose.

## CLASS ACTION ALLEGATIONS

72. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23. The proposed classes are defined as:

73. Plaintiff brings this action on behalf of herself and on behalf of all others similarly situated. The Classes are defined as:

> All accountholders who, during the applicable statute of limitations, were charged OD Fees on APPSN Transactions on a Keesler checking account.

> All accountholders who, during the applicable statute of limitations, were charged an overdraft protection transfer fee for a transfer that did not prevent an overdraft.

> Plaintiff also brings her claims on behalf of subclasses of Mississippi accountholders in the event the Court declines to certify a nationwide class.

74. Excluded from the Classes are Defendant, Defendant's subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

75.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or to add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

76.     The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because Keesler has acted on grounds generally applicable to the class.  Such common legal or factual questions include, but are not limited to:

   a)     Whether Keesler improperly charged OD Fees on APPSN transactions;

   b)     Whether Keesler improperly charged ODT Fees on futile transfers;

   c)     Whether the conduct enumerated above violates the contract;

   d)     Whether the conduct enumerated above violates the covenant of good faith and fair dealing;

   e)     Whether the conduct enumerated above constitutes unjust enrichment;

   f)     The appropriate measure of damages.

77.     The parties are numerous such that joinder is impracticable.  Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Keesler's records.  Keesler has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiff.

78.     It is impracticable to bring members of the Classes individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary

16

duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.  The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

79.    Plaintiff's claims are typical of the claims of the other members of the Classes in that they arise out of the same wrongful business practices by Keesler, as described herein.

80.    Plaintiff is a more than adequate representative of the Classes in that Plaintiff is a Keesler checking accountholder and has suffered damages as a result of Keesler's contract violations.  In addition:

a)    Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of accountholders against financial institutions;

b)    There is no conflict of interest between Plaintiff and the unnamed members of the Classes;

c)    Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d)    Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

81.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

82.    Keesler has acted or refused to act on grounds generally applicable to the class, thereby making appropriate corresponding declaratory relief with respect to the Classes as a whole.

83.    All conditions precedent to bringing this action have been satisfied and/or waived.

## COUNT ONE
## BREACH OF CONTRACT INCLUDING THE
## COVENANT OF GOOD FAITH AND FAIR DEALING
### (Individually and on Behalf of the Classes)

84.     Plaintiff repeats and incorporates all of the preceding allegations as if fully set forth herein.

85.     Plaintiff, and all members of the proposed Classes contracted with Keesler for checking account services, including debit card services.

86.     Keesler breached promises made to Plaintiff and all members of the proposed class when as described herein, Keesler charged OD Fees as a result of transactions that did not overdraw a checking account, on APPSN Transactions.

87.     Additionally, Keesler breached promises made to Plaintiff and all members of the proposed classes when as described herein, Keesler charged fees for futile OD transfers.

88.     In addition, there exists an implied covenant of good faith and fair dealing in all contracts that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

89.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify

18

terms, and interference with or failure to cooperate in the other party's performance.

90.     The implied covenant of good faith and fair dealing applies to the performance and enforcement of contracts, limits the parties' conduct when their contract defers decision on a particular term, omits terms, or provides ambiguous terms.

91.     Keesler has breached the covenant of good faith and fair dealing and abused its discretion in its contract as described herein. Specifically, Keesler should not have used its discretion to charge OD Fees on APPSN Transactions nor ODT Fees on futile OD transfers. The Account Documents do not have a contract term permitting OD Fees on such transactions, nor ODT Fees, and the documents are otherwise ambiguous as to any right for Keesler to charge OD Fees on APPSN Transactions or OD Fees on futile OD transfers.

92.     Plaintiff and all members of the proposed Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

93.     Plaintiff and all members of the proposed Classes have sustained damages as a result of Keesler's breaches of the contract.

**COUNT TWO**
**UNJUST ENRICHMENT**
**(In the Alternative to COUNT ONE)**
**(On Behalf of Plaintiff and the Classes)**

94.     Plaintiff repeats and incorporates all of the preceding allegations as if fully set forth herein.

95.     To the detriment of Plaintiff and the Classes, Defendant has been, and continues to be, unjustly enriched as a result of their wrongful conduct alleged herein.

96.     Plaintiff and the Classes conferred a benefit on Defendant when they paid Defendant the fees that were not disclosed or allowed for in the in the Customer Account Agreement.

97.     Defendant unfairly, deceptively, unjustly and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

98.     Plaintiff and the Classes, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

**COUNT III**
**Violation of Electronic Fund Transfers Act (Regulation E)**
**C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 et seq.))**
**(On Behalf of Plaintiff and the APPSN Class)**

99.     Plaintiff repeats and incorporates all of the preceding allegations as if fully set forth herein.

100.     By charging overdraft fees on APPSN transactions, Keesler violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. 1693 *et seq*.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

101.     Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. .. describing the institution's overdraft service" and (ii) "[p ]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program (*Id*.) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(l).) To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must

20

provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

102.    The intent and purpose of this Opt-In Contract is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB' s official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z)).

103.    Keesler failed to comply with Regulation E, 12 C.F.R. § 1005.17, including by failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Keesler's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account

to cover a transaction but Keesler pays it anyway, when in fact Keesler assesses overdraft fees when there is enough money in the account to pay for the transaction at issue.

104.    As a result of violating Regulation E, Keesler has harmed Plaintiff and the Class.

105.    Due to Keesler's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

A.    Certification for this matter to proceed as a class action on behalf of the Classes;

B.    Declaring Keesler's OD Fee policies and practices to be in breach of its contract with account holders;

C.    Restitution of all OD Fees and improperly assessed paid to Keesler by Plaintiff and the members of the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

D.    Actual damages in an amount according to proof;

E.    Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

F.    For costs and attorneys' fees under the common fund doctrine, and all other applicable law; and

G.    Such other relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this

Class Action Complaint that are so triable.

Dated:  November 4, 2021

Respectfully submitted,

By: */s/ Christopher J. Weldy*
     **WELDY LAW FIRM PLLC**
     Christopher J. Weldy, Esq.
     chris@weldylawfirm.com
     1438 N State St.
     Jackson, MS 39202
     Telephone: (601) 624-7460

     **SHAMIS & GENTILE, P.A.**
     Andrew J. Shamis, Esq. (*pro hac vice forthcoming*)
     Florida Bar No. 101754
     ashamis@shamisgentile.com
     gberg@shamisgentile.com
     14 NE 1st Avenue, Suite 705
     Miami, Florida 33132
     Telephone: 305-479-2299

     **EDELSBERG LAW, P.A.**
     Scott Edelsberg, Esq. (*pro hac vice forthcoming*)
     Florida Bar No. 0100537
     scott@edelsberglaw.com
     20900 NE 30th Ave., Suite 417
     Aventura, FL 33180
     Office: (786) 289-9471
     Direct: (305) 975-3320
     Fax: (786) 623-0915

     *Attorneys for Plaintiff and the Putative Classes*